**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

vs.                                    Case No. 8:20-CR-183-T-23-CPT

**JUAN CARLOS HURTADO-CALDERON**
_____/

**SENTENCING MEMORANDUM**

I.   **Legal Framework for Sentencing Analysis**

It is now well established that sentencing requires a two-step process. First, the district court must correctly calculate the sentencing guideline range. Second, the district court must consider the factors outlined in 18 U.S.C. §3553(a) to determine a reasonable sentence as to each defendant in each case.

In United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005), the Eleventh Circuit enumerated the ten factors used to determine a reasonable sentence: (1) the nature and circumstances of the offense and the defendant's personal history and characteristics; (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law and to provide a just punishment; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with appropriate educational training, vocational training, or medical care; (6) types of sentences available; (7) the correctly-calculated sentence range under the Sentencing Guidelines; (8) pertinent policy statements of the U.S. Sentencing

Commission; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to victims.

## II. Analysis of 18 U.S.C. § 3553(a) Factors

### A. History And Characteristics Of The Defendant

Juan Carlos Hurtado-Calderon is a 36-year-old citizen of Colombia.[1] Mr. Hurtado-Calderon was born in the Colombian Department of Chocó. Colombia is divided up into 32 geographic areas called departments.[2] The Department of Chocó is located in western Colombia and is primarily situated along the Pacific Ocean; it extends northward to encircle both sides of the Panamanian isthmus and also contains a short coastline on the Caribbean.[3]

Chocó has been described as "one of the most remote regions of the world."[4] The United Nations has recognized Chocó as the poorest Department in Colombia.[5] 78% of the residents in Chocó live beneath the Colombian poverty line.[6]

---

[1] PSR, Page 3
[2] "South America: Colombia." *The United States Central Intelligence Agency World Fact Book*, 2019, https://www.cia.gov/library/publications/the-world-factbook/geos/co.html.
[3] USA Today Online: http://traveltips.usatoday.com/climate-tutunendo-choco-colombia-104538.html
[4] Columbia University Anthropologist Michael Taussig: http://lens.blogs.nytimes.com/2011/11/02/looking-for-gold-in-a-distant-jungle/
[5] Office of the United Nations High Commissioner for Refugees: http://www.unhcr.org/3e8851624.html
[6] Diagnóstico de la situación de los municipios habitados por las comunidades afrocolombianas priorizadas por la Honorable Corte Constitucional en el departamento de Chocó:

Mr. Hurtado-Calderon is Afro-Colombian.[7] Most of the people who live in Chocó are descendants of African slaves brought there by colonial authorities of the Spanish empire.[8] Colombian municipalities with high populations of Afro-Colombians do not have sufficient government resources to provide basic services to their communities; 60% of Afro-Colombians do not have access to basic health care services and 57% of all babies born to Afro-Colombian mothers are premature.[9]

Mr. Hurtado-Calderon's childhood was grim. When he was approximately three years old, his mother died suddenly.[10] Mr. Hurtado-Calderon's family told him that a witch killed his mother by casting a spell on her.[11]

Less than a year after the death of Mr. Hurtado-Calderon's mother, Mr. Hurtado-Calderon's father remarried.[12] Mr. Hurtado-Calderon's stepmother was physically abusive to him.[13] On one occasion, when Mr. Hurtado-Calderon got into an argument with one of his stepmother's natural born sons, his stepmother ended the

---

http://www.derechoshumanos.gov.co/Observatorio/documents/2010/DiagnosticoAfro/Choco.pdf
[7] PSR, Page 3
[8] Simon Romero, New York Times Online:
http://lens.blogs.nytimes.com/2011/11/02/looking-for-gold-in-a-distant-jungle/
[9] Minority Rights, *Colombia – Afro-Colombian*, webpage: http://minorityrights.org/minorities/afro-colombians/
[10] PSR, page 7.
[11] December 16, 2020 interview of Juan Carlos Hurtado-Calderon.
[12] PSR, Page 7;  December 17, 2020 interview of Juan Carlos Hurtado-Calderon.
[13] December 16, 2020 interview of Juan Carlos Hurtado-Calderon.

3

argument by attacking Mr. Hurtado-Calderon with a rawhide bullwhip.[14] Mr. Hurtado-Calderon still bears a small scar on the right side of his lower back from where one of the blows of the whip made its impact.[15] Mr. Hurtado-Calderon's stepmother did not want Mr. Hurtado-Calderon to live in her home. When he was around eight years old, Mr. Hurtado-Calderon was sent to live with his paternal grandparents.[16]

Though Mr. Hurtado-Calderon's grandparents loved him and treated him well, they were desperately poor.[17] The home in which they lived was a wooden structure with two rooms and a palm frond roof.[18] When it rained, water leaked into the home through the fronds.[19] The windows had no screens and mosquitos entered easily, bringing with them the danger of malaria which was common in the community.[20] Mr. Hurtado-Calderon's grandparents could not afford to buy him a bed, so his grandmother sewed some rags together to give him a makeshift blanket on which he could lay.[21] The home had no running water or electricity, and Mr. Hurtado-Calderon's grandparents could only afford to feed him once a day.[22]

---

[14] Id.
[15] Id.
[16] Id.
[17] Id.
[18] Id.
[19] Id.
[20] Id.
[21] December 17, 2020 interview of Juan Carlos Hurtado-Calderon.
[22] PSR, page 7.

Because his grandfather was going blind and could not continue to work, Mr. Hurtado-Calderon became the breadwinner for his grandparents when he was ten years old.[23] Mr. Hurtado-Calderon found a job with a timber cutting company.[24] The work was arduous, as he was obligated to carry heavy pieces of wood on his back, often thorough deep mud.[25] Mr. Hurtado-Calderon did not have any shoes, so he frequently suffered cuts to his feet from branches and rocks.[26] For his toil, Mr. Hurtado-Calderon was paid around $4.00 for six hours of work.[27] Despite these travails, Mr. Hurtado-Calderon did not give up on his education.[28] He enjoyed his studies and was able to attend school for several hours a day.[29] He eventually graduated from high school.[30]

While Mr. Hurtado-Calderon was growing up, Colombia was engaged in civil war.[31] The Department of Chocó where Mr. Hurtado-Calderon resided was a battleground of the war, and many civilians, often poor Afro-Colombian or

---

[23] December 16, 2020 interview of Juan Carlos Hurtado-Calderon.
[24] Id.
[25] Id.
[26] Id.
[27] Id.
[28] Id.
[29] Id.
[30] PSR, Page 9.
[31] December 16, 2020 interview of Juan Carlos Hurtado-Calderon.

5

indigenous populations, were caught in the crossfire of this power struggle.[32] Mr. Hurtado-Calderon was a witness to this violence; there were numerous murders in the area in which he lived, and many of his classmates were kidnapped and trained as guerillas by the Revolutionary Armed Forces of Colombia (FARC).[33]

When Mr. Hurtado-Calderon was in his mid-twenties, he was drafted into the Colombian Army.[34] Sadly, while Mr. Hurtado-Calderon was serving in the army, his paternal grandfather, who had been like a father to him, passed away.[35] Upon the successful completion of his military service, Mr. Hurtado-Calderon returned to Chocó to find work and care for his grandmother.[36]

Mr. Hurtado-Calderon is the father of three minor children, ages eight, ten, and sixteen.[37] To support his children, Mr. Hurtado-Calderon has worked as a security guard, a fisherman, a field hand, and as a medical office receptionist.[38] Before his arrest in this matter, Mr. Hurtado-Calderon had been living with his family in the City of Buenaventura, Colombia.[39]

---

[32] David Gagne, *Why is Choco a Haven for Colombia's Criminal Groups?*, November 27, 2014, https://www.insightcrime.org/news/analysis/choco-colombia-criminal-haven/
[33] Id. at 8.
[34] December 16, 2020 interview of Juan Carlos Hurtado-Calderon.
[35] Id.
[36] Id.
[37] PSR, Page 8.
[38] PSR, Page 9; December 16, 2020 interview of Juan Carlos Hurtado-Calderon.
[39] PSR, Page 8

## B. The Need To Protect The Public

Mr. Hurtado-Calderon is not a danger to reoffend.

First, Mr. Hurtado-Calderon is 36 years old.[40] If Your Honor were to grant a two-level downward variance at sentencing, Mr. Hurtado-Calderon's low-end sentencing guideline would be 108 months (i.e., 9 years). Therefore, assuming Mr. Hurtado-Calderon were to serve 85% of his sentence, he would not be released under around his 44th birthday. Prison inmates released in their mid-forties have lower recidivism rates than their younger cohorts.[41]

Second, Mr. Hurtado-Calderon has no criminal history whatsoever. The United States Sentencing Commission has noted that first time offenders such as Mr. Hurtado-Calderon are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend.[42]

Third, Mr. Hurtado-Calderon is well aware that when he agreed participate in this smuggling venture that he made the biggest mistake in his life. The results of that decision have been disastrous for him; he has been plucked from his native country,

---

[40] PSR, Page 3
[41] See United States v. Nellum, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (noting that according to the United States Sentencing Commission, recidivism rates decline consistently as age increases.); See also: U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, 12 (May 2004) (noting that recidivism rates "decline relatively consistently as age increases").
[42] *Recidivism and the First Offender*, United States Sentencing Commission, May 2004

stripped of all that is familiar to him, and separated indefinitely from his family. Most stinging to Mr. Hurtado-Calderon, he has lost the ability to support his three children. Given the great privation and suffering he experienced as a child, Mr. Hurtado-Calderon knows the hardship his children are likely to endure in the coming years.[43]

When the Bureau of Prisons does eventually release Mr. Hurtado-Calderon, he will undoubtedly steer clear of any contact with drug shipments for the remainder of his life.

### C. The Correctly-Calculated Sentence Range Under The Sentencing Guidelines

The PSR calculates Mr. Hurtado-Calderon's advisory guideline range to be an offense level 33, Criminal History I.[44] This Guideline range carries a recommended sentence of 135 to 168 months imprisonment.[45]

---

[43] Studies in the United States have shown that among children of incarcerated fathers, there are higher rates of homelessness, poor developmental outcomes, and greater family instability. *See*: When A Parent Goes To Prison, A Child Also Pays A Price; National Public Radio, June 8, 2014.
[44] PSR, Pages 6-7.
[45] USSG Sentencing Table

### III. <u>Conclusion</u>

The Defense respectfully requests this Court take all the forgoing factors into consideration and vary downward two offense levels, which would result in a sentence of 108 months of incarceration. Such a sentence would be "sufficient but not greater than necessary to comply with" the goals of sentencing set forth in 18 U.S.C. § 3553(a).

                                                      Respectfully submitted,

                                                     <u>/s/ *David C. Hardy*</u>
                                                     David C. Hardy
                                                     FL Board Certified – Criminal Trial Law
                                                     Florida Bar No. 689661
                                                     The Hardy Law Firm, P.A.
                                                     1710 N. 19th Street, Suite 215
                                                     Tampa, FL 33605
                                                     Telephone (813) 990-9547
                                                     Email: <u>dch@thehardylawfirm.com</u>

## EXHIBITS

| | |
|---|---|
| Exhibit 1A | Letter in Spanish from Ms. Fanny Angulo Sinisterra |
| Exhibit 1B | English Translation of Letter from Ms. Fanny Angulo Sinisterra |
| Exhibit 1C | Certification of Translation of Letter from Ms. Fanny Angulo Sinisterra |

## Certificate of Service

I HEREBY CERTIFY that on the 17th day of December 2020, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to Special Assistant United States Attorney Dan Baeza.

/s/ *David C. Hardy*
David C. Hardy
FL Board Certified – Criminal Trial Law
Florida Bar No. 689661
The Hardy Law Firm, P.A.
1710 N. 19th Street, Suite 215
Tampa, FL 33605
Telephone (813) 990-9547
Email: dch@thehardylawfirm.com